ORIGINAL

Approved: _____
ANDREW JONES / JANE CHONG
Assistant United States Attorneys

Before:   THE HONORABLE ROBERT W. LEHRBURGER
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - - X

**23 MAG 331**

UNITED STATES OF AMERICA

- v. -

JAMES WHITE,

                    Defendant.

- - - - - - - - - - - - - - - - - - X

**SEALED COMPLAINT**

Violations of
18 U.S.C. §§ 371, 1349,
and 1956(h)

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

        BENEDICT CASTRO, being duly sworn, deposes and says
that he is a Special Agent with the Internal Revenue Service-
Criminal Investigation ("IRS-CI"), and charges as follows:

### COUNT ONE

(Conspiracy to Commit Securities Fraud)

        1.   From at least in or about April 2019, up to and
including at least in or about April 2022, in the Southern
District of New York and elsewhere, JAMES WHITE, the defendant,
and others known and unknown, willfully and knowingly did
combine, conspire, confederate and agree together and with each
other to commit an offense against the United States, to wit,
securities fraud, in violation of Title 15, United States Code,
Sections 78j(b) and 78ff, and Title 17, Code of Federal
Regulations, Section 240.10b-5.

        2.   It was a part and an object of the conspiracy that
JAMES WHITE, the defendant, and others known and unknown,
willfully and knowingly, directly and indirectly, by use of the
means and instrumentalities of interstate commerce, and of the
mails, and of the facilities of national securities exchanges,
would and did use and employ, in connection with the purchase

and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### Overt Acts

3.   In furtherance of the conspiracy and to effect its illegal object, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about February 12, 2020, a member of the conspiracy caused approximately $12,000 to be wired through a bank account in New York, New York, to a bank account in Glen Cove, New York.

b.   On or about August 26, 2020, a member of the conspiracy caused approximately $109,975 to be wired through a bank account in New York, New York, to a bank account in Glen Cove, New York.

c.   On or about September 10, 2020, a member of the conspiracy caused approximately $12,000 to be wired through a bank account in New York, New York, to a bank account in Glen Cove, New York.

d.   On or about December 7, 2020, a member of the conspiracy caused approximately $95,985 to be wired through a bank account in New York, New York, to a bank account in Glen Cove, New York.

e.   On or about December 10, 2020, a member of the conspiracy caused approximately $17,485 to be wired through a bank account in New York, New York, to a bank account in Glen Cove, New York.

(Title 18, United States Code, Section 371.)

2

## COUNT TWO

(Conspiracy to Commit Wire Fraud)

4.    From at least in or about April 2019, up to and
including at least in or about April 2022, in the Southern
District of New York and elsewhere, JAMES WHITE, the defendant,
and others known and unknown, willfully and knowingly did
combine, conspire, confederate, and agree together and with each
other to commit wire fraud, in violation of Title 18, United
States Code, Section 1343.

5.    It was a part and object of the conspiracy that JAMES
WHITE, the defendant, and others known and unknown, knowingly
having devised and intending to devise a scheme and artifice to
defraud and for obtaining money and property by means of false
and fraudulent pretenses, representations, and promises, would
and did transmit and cause to be transmitted by means of wire,
radio, and television communication in interstate and foreign
commerce, writings, signs, signals, pictures, and sounds for the
purpose of executing such scheme and artifice, in violation of
Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

## COUNT THREE

(Conspiracy to Commit Money Laundering)

6.    From at least in or about April 2019 up to and
including at least in or about April 2022, in the Southern
District of New York and elsewhere, JAMES WHITE, the defendant,
and others known and unknown, intentionally and knowingly did
combine, conspire, confederate, and agree together and with each
other to commit money laundering, in violation of Title 18,
United States Code, Sections 1956(a)(1)(B)(i) and
1956(a)(2)(B)(i).

7.    It was a part and an object of the conspiracy that
JAMES WHITE, the defendant, and others known and unknown, in an
offense involving and affecting interstate and foreign commerce,
knowing that the property involved in certain financial
transactions, to wit, cash and wire transactions, represented
the proceeds of some form of unlawful activity, would and did
conduct and attempt to conduct such financial transactions,
which in fact involved the proceeds of specified unlawful
activity, to wit, wire fraud, knowing that the transactions were

designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

8.     It was further a part and an object of the conspiracy that JAMES WHITE, the defendant, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, to wit, wire fraud, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Section 1956(h).)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

9.     I am a Special Agent with the IRS-CI and I have been personally involved in the investigation of this matter. I have worked on this investigation with Special Agents of Homeland Security Investigations and the United States Attorney's Office for the Southern District of New York. This affidavit is based upon my investigation, my conversations with witnesses and other law enforcement agents, my review of bank records, my review of business incorporation records, my examination of physical evidence, and my examination of electronic communications recovered from searches of property belonging to multiple co-conspirators who have previously been charged and convicted for their roles in the scheme. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

4

Overview of the "Boiler Room" Investment Fraud Scheme

10.   From my participation in this investigation, which
includes my interviews with victims, my review of wire transfer
and bank records, my review of electronic communications between
co-conspirators, and my review of accounting records maintained
by the co-conspirators, I know that since at least 2019, lasting
until at least 2022, a group of conspirators operating in the
United States and abroad, including in Thailand, have been
engaged in a scheme to defraud victim investors by purporting to
sell the victims securities and other investments, and to
launder the proceeds of this fraud. This type of fraud is
commonly referred to as a "boiler room." Victims of the boiler
room believed they were making legitimate investments and were
directed to make payments for these "investments" by
international wire transfer into a series of bank accounts in
New York. Victims did not receive anything in exchange for their
payments, though in many instances, conspirators falsely
represented that the value of a victim's initial "investment"
had appreciated and induced the victim to make even larger
payments to the conspirators under the guise of making
additional investments.

11.   From conversations with victims of the scheme and from
reviewing records provided by victims, I have learned that the
fraudulent scheme typically operated as follows:

a.   The conspirators working for the boiler rooms
(the "Boiler Room Conspirators") would contact victim investors
by phone, email, or other means to offer victims investment
opportunities. Nearly all victims of the scheme resided outside
of the United States. In some instances, victims had previously
responded to online advertisements relating to investments, and
in other instances, the Boiler Room Conspirators would cold-call
victims.

b.   The Boiler Room Conspirators purported to
represent a variety of investment firms. In most instances, the
fraudulent investment firms used names that closely resembled
the names of legitimate, regulated investment firms. These
fraudulent investment firms were frequently portrayed to victims
as operating from Manhattan, when in fact, the Boiler Room
Conspirators operated from locations such as Thailand and
Panama. During calls with victims, the Boiler Room Conspirators
directed the victims to professional-appearing websites to
further the impression that the conspirators were agents of
legitimate investment firms.

c.    In their dealings with the Boiler Room
Conspirators, victims would usually first be contacted by
someone described as a junior advisor with the fraudulent
investment firm. The junior advisor would gauge a victim's
interest and ability to invest large sums with the fraudulent
investment firm. If the victim seemed interested in investing,
the junior advisor would tell the victim that the victim would
be contacted by a senior advisor to complete the process. A
senior advisor would later contact the victim to convince the
victim to invest with the fraudulent investment firm and close
the deal. The victims of the scheme were usually told they were
purchasing shares of American companies, including companies
that were listed on public stock exchanges. After victims agreed
to invest with the fraudulent investment firm, the victims were
directed to make wire transfers to bank accounts that they were
told were "escrow accounts" held by "transfer agents" [1] in, among
other places, New York.

d.    After making payments to these "escrow accounts,"
victims were provided documents that purported to show the
change in beneficial ownership of securities. Victims were also
able to access websites that purported to show their individual
investment accounts. The Boiler Room Conspirators continued to
contact victims to convince them to make additional investments.
In almost every instance, if a victim became suspicious and
requested a refund of their purchase or requested that the
Boiler Room Conspirators sell the securities the victim
purportedly owned, the Boiler Room Conspirators ceased contact
with the victim, and the victim was unable to recover any
losses. Victims never received the stocks or other investment
vehicles they believed they had purchased.

<u>Overview of the Money Laundering Scheme</u>

12.   The "escrow accounts" to which the victims sent their
funds included bank accounts in the United States held by a
network of businesses created by the conspirators in furtherance
of the scheme. The businesses and the accounts lacked any
legitimate purpose. Instead, the businesses and accounts
furthered the fraud scheme in multiple ways. First, the use of

---

[1] The term "transfer agent" refers to a company that keeps track
of individuals and entities that own the stocks and bonds of a
given company that has publicly traded securities. Among other
things, transfer agents issue and cancel certificates to reflect
changes in ownership, serve as the company's intermediary for
payouts, exchanges, or mailings, and handle lost, destroyed or
stolen certificates.

businesses distanced the conspirators from the fraud scheme. Second, the use of American businesses and bank accounts helped convince overseas victims that their purported investments in American securities were legitimate. And third, the accounts were used to wire the fraud proceeds back to the boiler rooms overseas, in transactions designed to conceal the illicit nature of the money being sent abroad.

13.   Based on information provided by a co-conspirator who operated and directed the management of numerous businesses and bank accounts that served as "escrow accounts" in this scheme ("CC-1"),[2] accounting records maintained by CC-1 in furtherance of the scheme, and account records maintained by the banks that operated the "escrow accounts," I am aware of the following:

a.   CC-1 conspired with numerous others (the "Money Laundering Conspirators")[3] to operate five businesses and thirteen bank accounts in New York that lacked any legitimate business purpose (the "New York Shell Companies" and the "New York Shell Company Accounts"). The Shell Companies and the Shell Company Accounts were operated in and around Glen Cove, New York.

b.   The Money Laundering Conspirators partnered with the Boiler Room Conspirators to receive, launder, and redistribute the investment fraud proceeds stolen from victims. The Money Laundering Conspirators received a percent of the fraud proceeds that typically ranged between fifteen and twenty-five percent. The remaining fraud proceeds were to be paid to the Boiler Room Conspirators.

c.   The Money Laundering Conspirators opened the New York Shell Company Accounts at large, national banks in the United States with the intent that the use of those banks would engender a false sense of security in victims who were being directed to make payments to the accounts. When opening the New York Shell Company Accounts, the Money Laundering Conspirators made false representations to banks about the business of the

---

[2] CC-1 has pleaded guilty to securities fraud, wire fraud, and money laundering offenses and is cooperating in the hopes of receiving leniency at sentencing. CC-1's information has proven reliable and has been corroborated by other evidence, including the bank records and accounting records described below.

[3] In addition to CC-1, three additional Money Laundering Conspirators have pleaded guilty for their participation in this scheme and have been sentenced or are awaiting sentencing.

7

New York Shell Companies. For example, the New York Shell
Companies were at times described as being real estate firms,
market research firms, or a construction company.

       d.   Between in and about April 2019 and in and about
December 2020, the New York Shell Company Accounts received
approximately $8.4 million from victims of boiler room
investment fraud schemes. The accounts were funded almost
exclusively by wire transfers from individuals located outside
of the United States that were victims of the fraud. These wires
ranged in value from less than $500 to nearly $400,000 in a
single transaction. Based on my interviews with victims of the
scheme, I am aware that many, if not all, of these wires were
intended to fund purported investments, and specifically the
purchase of securities.

       e.   Many of the wire transfers to the New York Shell
Company Accounts had payment descriptions indicating an intended
purchase of securities. For example, there were wires with the
following notations: "Trade Payment NYSE," "Palantir IPO," and
"Airbnb IPO." Also, in numerous instances, the payment
description included a combination of the victim's initials or
name and a series of numbers, or a string of numbers. Based on
my review of wiring instructions and payment confirmations sent
from the Boiler Room Conspirators to certain victims, I know
that the Boiler Room Conspirators frequently gave the victims
unique account numbers or transaction numbers to include in the
payment details of the wire transfers the victims sent to the
New York Shell Companies, which is consistent with the payment
details I observed in the account records of the New York Shell
Company Accounts.

       f.   From reviewing bank records for the New York
Shell Companies, I have learned that in many instances, to
complete a wire transfer between a foreign victim and a domestic
shell company, a correspondent or intermediary bank was
involved. In my training and experience, I know that
correspondent and intermediary banks are used to facilitate
international wire transfers between two banks that do not have
a direct banking relationship. Based on these same bank records,
I know that many of the wire transfers from victims to the New
York Shell Companies were processed through correspondent and
intermediary banks located in the Southern District of New York.
For example:

          i.   On or about February 12, 2020, a victim in
Canada wired $12,000 through a correspondent bank in New York,

New York to an account held by one of the New York Shell
Companies.

                    ii.     On or about August 26, 2020, a victim in
Canada wired $109,975 through a correspondent bank in New York,
New York to an account held by one of the New York Shell
Companies.

                    iii.    On or about September 10, 2020, a victim in
Australia wired $12,000 through a correspondent bank in New
York, New York to an account held by one of the New York Shell
Companies.

                    iv.     On or about December 7, 2020, a victim in
Canada wired $95,985 through a correspondent bank in New York,
New York to an account held by one of the New York Shell
Companies.

                    v.      On or about December 10, 2020, a victim in
Canada wired $17,485 through a correspondent bank in New York,
New York to an account held by one of the New York Shell
Companies.

            g.      Based on my review of account records, I am aware
that from in and about April 2019 to December 2020, the New York
Shell Company Accounts paid more than $5.1 million in outgoing
international wire transfers. Most of these wire transfers were
paid to accounts in Thailand and the Philippines. Wire notations
for the vast majority of these outgoing payments described the
payments as being for "consultancy expenses." From reviewing
bank records for the New York Shell Companies, I have learned
that in many instances, payments from the New York Shell
Companies to the overseas bank accounts were processed through
correspondent and intermediary banks located in the Southern
District of New York.

    14.     From my participation in the investigation, I know
that in and about December 2020, residences in Glen Cove, New
York belonging to multiple of the Money Laundering Conspirators
were searched pursuant to a judicially authorized warrant. Bank
records for the New York Shell Company Accounts reflect that the
accounts stopped making outgoing payments after the search
warrants were executed.

    15.     From speaking with victims of the investment fraud
scheme and reviewing documents sent to the victims by the Boiler
Room Conspirators, I know that after the New York Shell
Companies and their accounts stopped making payments to the

                                9

Boiler Room Conspirators, in and about December 2020, victims were directed to send their payments to other "escrow accounts," including accounts in the United States and abroad.

## JAMES WHITES's Participation in the Scheme

16.    JAMES WHITE, the defendant, is a United States citizen who resides in Thailand. In 2017, WHITE was issued a United States passport with a particular passport number (the "White U.S. Passport").

17.    As part of the investigation, I have interviewed CC-1, who, as previously described was involved in managing the New York Shell Company Accounts. As part of his management of the accounts, CC-1 maintained accounting records that tracked the flow of money from victims and its distribution back to the Boiler Room Conspirators, less a percentage maintained by CC-1 and the other Money Laundering Conspirators involved with operating the New York Shell Company Accounts. According to CC-1, JAMES WHITE, the defendant, was a Boiler Room Conspirator operating primarily from Thailand. WHITE solicited fake investments from victims, directed the victims to pay into the New York Shell Company Accounts, and then coordinated with CC-1 to have the victims' money sent from the Shell Company Accounts to him at bank accounts he controlled in Thailand. CC-1 also knows that WHITE partnered and worked with another Boiler Room Conspirator ("CC-2").[4]

18.    JAMES WHITE, the defendant, operated a bank account in Thailand that received money that was stolen from victims of the fraud scheme, laundered through the New York Shell Company Accounts, and then sent to WHITE. Based on my review of account records for the New York Shell Company accounts, I am aware that between July 2019 and September 2020, the accounts made 18 international wire transfers, totaling approximately $145,854, to an account in Thailand with a beneficiary of "James White" or "James Henry White" (the "White Account"). Based on records received from Thailand, pursuant to a mutual legal assistance request, I am aware that the White Account was opened with the White U.S. Passport as the means of identification of the account holder.

---

[4] In April 2022, CC-2 was convicted by a jury for his participation in this scheme.

19.   Based on my review of CC-1's accounting logs, I am aware that CC-1 recorded bank account information for the White Account in Thailand as belonging to "James White."

20.   Based on my review of the contents of a cellphone seized from CC-2 (the "CC-2 Phone"), I am aware that JAMES WHITE, the defendant worked directly and in concert with CC-2 to operate a boiler room investment fraud. Among other things in the CC-2 Phone, I am familiar with the following:

a.   The CC-2 Phone has a WhatsApp communications log with a contact saved as "A A James NN" that spans October 2019 to August 2021, which I am aware was when CC-2 was arrested. Based on my review of the communications log, I believe that "A A James NN" is JAMES WHITE, the defendant. This belief is based on the contact name and because on or about November 26, 2020, the communications log shows that CC-2 sent "A A James NN" a series of photos, many of which show CC-2, whose appearance I know from personal observations, with WHITE, whose appearance I know from his passport photo.

b.   On or about September 9, 2020, WHITE sent CC-2 a text message that read, "Call when available need to talk with you about an allocation ! Cheers". I understand, based on my involvement in this investigation, that "allocation" refers to the process during which the Boiler Room Conspirators get a victim to commit to paying for certain investments.

c.   On or about September 25, 2020, CC-2 sent WHITE an audio recording of CC-2 speaking with a customer service representative at a bank in Thailand. The substance of the call involved CC-2 trying to find out the status of a payment into an account for approximately $97,580. From interviewing CC-1, I am aware that payment for $97,580 was a disputed payment of fraud proceeds between CC-1 and CC-2.

d.   On or about February 8, 2021, WHITE sent CC-2 two images of a stock certificate for a publicly listed pharmaceutical company, followed by a link to a website discussing investments in a second pharmaceutical company and a message that read "Hope its not to late to sell out client". I am aware from interviewing CC-1 that Boiler Room Conspirators and Money Laundering Conspirators frequently refer to victims as "clients." I am also aware, from interviewing victims that some victims of the scheme believed they had purchased shares of both pharmaceutical companies that WHITE and Booth discussed.

e.    The CC-2 Phone has a second WhatsApp communications log with a contact saved as "AA James 3" which I believe is a second contact number for WHITE. There is only one message in this log. On or about March 5, 2021, CC-2 sent WHITE a screen shot of a Facebook profile for CC-1, the money launder with whom CC-2 had worked.

21.   Based on my review of the contents of two cellphones seized from CC-1, following CC-1's arrest in or about February 2021, and based on my interviews with CC-1, I am aware that CC-1 communicated with JAMES WHITE, the defendant by the encrypted messaging application Telegram. The contact phone number saved in one of CC-1's phones for WHITE, who was saved as the contact name "James Thai," by CC-1, is the same phone number saved for the "A A James NN" contact in the CC-2 phone. Communications between WHITE and CC-1 span approximately August 2019 to February 2021. Among other things, WHITE and CC-1 discussed the investment fraud and money laundering schemes. For example:

a.    On or about August 14, 2019, WHITE sent CC-1 a pdf document that was a wire transfer confirmation for a payment of approximately $8,500 that had been sent to one of the New York Shell Company Accounts. Account records for the New York Shell Company Accounts confirm the payment.

b.    On or about February 5, 2020, WHITE sent CC-1 a pdf document that was a wire transfer confirmation for a payment of approximately $5,723 that had been sent to one of the New York Shell Company Accounts. Account records for the New York Shell Company Accounts confirm the payment.

c.    On or about September 30, 2020, WHITE wrote to CC-1: "Hope well,,,,,,,,,, any updates from your partner thks ,,,,,,,,,,, im keeping [CC-2] in check hope this arrangement works well for you so we can continue doing business".

d.    On or about February 17, 2021, WHITE wrote to CC-1: "[CC-2] wants to know if u have NY BANK ready to go if not win ,,,,,, has nice order to put through?! Cheers". I understand from speaking with CC-1 that the name in the text message is a reference to CC-2, and that in this message, WHITE is inquiring about the availability of a money laundering account in New York to direct a victim to pay into.

WHEREFORE, the deponent respectfully requests that a warrant be issued for the arrest of JAMES WHITE, the defendant,

and that he be arrested, and imprisoned or bailed, as the case
may be.

S/ by the Court with permission
_____
Special Agent Benedict Castro
Internal Revenue Service-
Criminal Investigation


Sworn to me through the transmission of this Affidavit by
reliable electronic means, pursuant to Federal Rules of Criminal
Procedure 41(d)(3) and 4.1,

this **13th** day of January, 2023.

_____
THE HONORABLE ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK